Next case, 21-4116, Black Iron v. Wells Fargo Rail Good morning, your honors. May it please the court, Caroline Olsen on behalf of Utah Iron and Gilbert Development Corporation. I'm here with my co-counsel, Dick Baldwin, but I'll be the only one arguing today. I plan to reserve three minutes rebuttal and I will try to monitor my time for that. This court should reverse the decisions below because the bankruptcy court made several errors both at summary judgment and post-trial. I plan to start with the most straightforward ground for reversal. The bankruptcy court got wrong the date at which Wells Fargo lost authorization to retrieve the equipment from Black Iron's property. That error, which must be reviewed under a summary judgment standard, requires the reversal of at least three claims. It undermines the court's decision that Black Iron was liable for conversion. It undermines the bankruptcy court's decision on trespass. And it undermines the court's decision on unjust enrichment. On top of all that, it dictates a recalculation of damages. So what you said, the district court got wrong was the date of what? The date at which Wells Fargo lost the ability to access its equipment. And I can give you the court just to clarify what this error is. I'm going to go through, walk through each of the why that dictates reversal on a number of claims.  So lost access to their cars completely, or lost access to the ability to move those cars? To move. To move. So just so that we're all on the same page, the bankruptcy court concluded at summary judgment that Wells Fargo lost the ability to remove its equipment on August 20, 2015, the date that a Black Iron employee sent a cease and desist email to Wells Fargo. Based on that, the bankruptcy court determined that Wells Fargo lacked the ability to remove its equipment from August 2015 to March 2016. In fact, the evidence shows that Wells Fargo's access was restored just one month after the cease and desist letter on September 17, 2015, and then was continuous until August of 2016. That means that with one brief interruption, Wells Fargo had the ability to remove its equipment from May 2015 to August 2016, and it failed to do so. What's the evidence of that date? Your Honor, the date of the September 17, 2015? Yes. Yeah, okay. And that it stayed open through August of 2016. Sure, Your Honor. There's, to be clear, there's no dispute in the record that Wells Fargo had access from March 2016 to August 2016. So the only thing, so the question is what's the evidence between September 2015 and March 2016, and there's several pieces, all of which were cited in our summary judgment papers below. First is the email from Wells Fargo's counsel, where they are confirming the conversation they had with Black Iron, and they confirm that they just had a conversation that, and quote, to remove First Union's locomotives and rail cars, and essentially says, you just granted us access to do that, correct? That's at Appellate Volume 8 at page 40 of the record. The only reasonable inference to draw from that email was that access was, in fact, granted. And remember, we're at summary judgment, so all inferences have to be drawn in our favor. I mean, but that's out of context, though, isn't it? Wasn't there more said in that email about money owed for storage? I don't, I don't think so. I think, Your Honor, the relevant point is that Wells Fargo, the Wells Fargo's counsel was reaching out and said, we just had a conversation where you told us that we have access and the ability to remove our equipment, and we want to confirm that through this writing. The district court discounted that in part because the response to that was not in the record, but this is summary judgment, which means we get all inferences in our favor. But even if that were not sufficient to create a triable issue, there are multiple other documents in the record that I'd like to walk you through. The first is an internal Wells Fargo's email from the same date, September 17, 2015, where a Wells Fargo employee states, we have been advised that we have a new opportunity to access the cars and, quote, move them out. That's Appellate Volume 7 at 212 of the record, again, was cited in our motion for summary judgment, a response to Wells Fargo's motion for summary judgment. Third, Black Iron, there's a Black Iron and Wells Fargo email chain through the course of the fall, where the two employees are essentially negotiating and talking about potential dates for Wells Fargo to come in and remove the equipment, again, using terms of remove, not just access to repair. And there's a direct quote where... Well, there's a discussion internally, but Black Iron, that's not the same as consent to come in and move, because that's not conveyed to Wells Fargo, just their internal... And we've also got all these statements on the other side about, I don't want them to come in. I do not want them to move them. And so, I mean, yeah, you have the right to all evidence that is supportive of you, but it doesn't mean that you have the right to have opposing evidence disregarded. Your Honor, with respect to the statements that you mentioned about, I think you're referencing statements from Steve Gilbert about keeping them out. Those were all in the context of, and around August 20th, the date of the cease and desist email, all of the communications that I'm referencing post-date that, after conversations, including the conversation referenced in the September 17th, 2015 email, where Black Iron's counsel and Wells Fargo's counsel then verified that they were given access to come in and remove the equipment. And I would just say, too, that at the appellate record, volume 12, page 300, and then appellate volume 13 at 3, those are conversations between a Wells Fargo employee and a Black Iron employee, where the Black Iron employee confirms you have a green light to come in and remove your equipment. And so, at a minimum, that raises a genuine question of fact as to whether they have the Fargo has pointed out and said, look, there were email communications and there were affidavits that said we had access as of March 2016. What those communications and those affidavits tellingly don't say is that they actually did not have the ability to come in and remove their equipment prior to that date. So, if the court agrees with us on the question of the error in the conversion date, that dictates a number of cascading consequences on the court's legal conclusions. First, if it agrees with us that the date of conversion could not have been August of 2015, or at minimum, that there was a disputed question of fact as to that date, then that is a reversal of the court's trespass analysis. The bankruptcy court dismissed Black Iron's trespass claim because it concluded that Wells Fargo's attempts to recover their equipment were reasonable as a matter of law, but it did so assuming that Wells Fargo only had the ability to access and remove its equipment from May until August of 2015. If this court agrees that the date was erroneous, then Wells Fargo had closer to 15 months with just a short one-month interruption to remove its equipment, and the reasonableness analysis on trespass is totally different. That argument also works to defeat the court's decision on liability for conversion more generally, which its analysis there was essentially the flip side of the trespass analysis, and its assessment that Wells Fargo made reasonable efforts within just three months to remove its equipment. Again, if the analysis is then expanded to closer to 14 or 13 months, that analysis looks totally different. And the unjust enrichment analysis is also totally different. The equities look different if it took Wells Fargo 13 or 14 or 15 months to remove its equipment rather than just the three months that the district court analyzed. So just on that one error alone requires a reversal on all of the legal claims, on all of those legal claims, unjust enrichment, trespass, and conversion. Let's talk a little bit about some of your claims. So you have a storage-speak claim that is based on an agreement, and then at the same time you have a trespass claim, which presumably is based on the rail cars being there without an agreement. How do you square that? Well, we can always have arguments in the alternative. Indeed. I'll talk a little bit about, I mean, the trespass. But how does, I mean, look, you're telling us what your evidence is up here. I mean, how does your evidence square on that? I mean, does your own evidence fall in line with the idea that there's an agreement? Or does your evidence support the idea that there's a trespass? Your Honor, we do think that there was at least a tribal question as to whether there was a meeting of the mind for an agreement. Steve Gilbert actually testified in his deposition. I think there was a meeting of a mind, and he talks about a conversation he had in May with a First Union, ultimately, Wells Fargo employee, where he said, you know, basically, what do we need to do? The Wells Fargo employee said, basically, what do we need to do to not pay you anything? And Steve said, get your equipment off my property and we'll be okay. You won't owe me storage fees. And he testified and said, I thought that was a meeting of the minds, and so at least that's enough to create a tribal issue of fact. The fact that he testified he thought there was a meeting of the minds creates a fact issue for trial? I think that combined with his description of the conversation, of his conversation with what the Wells Fargo employee is sufficient to, and the way that that conversation went down. Either way, I just want to talk briefly about trespass, because as I said, I think that's an easier ground for reversal given the error that the court made on the conversion date. Because if the question is simply whether or not Wells Fargo's efforts to remove the there's an open question as to whether or not they had to remove their equipment as of August 2015 or August 2016, that analysis looks totally different and that provides a much more cleaner way for this court to just issue a reversal on all the other grounds. What is the earliest date on which you contend they had to have the cars removed for there not to be a trespass? I think that that is a question that we would want to probably resolve at trial. I mean, you have to have a position on it. I mean, at summary judgment you had to come forward with evidence showing when the trespass began, didn't you? Well, they moved for summary judgment on our claim. Right, and you were going to rebut it. I would say that at a minimum we would say it after three months. And interestingly, if you look at the leases in the record between CML and Wells Fargo, they actually only provided for what is essentially three months of free storage on CML's property before Wells Fargo had to remove the equipment. And so if you're looking for a proxy or some evidence, Wells Fargo themselves seem to think that they'd be able to get the equipment out or figure out what to do with the equipment within a period of three months. And so that's a pretty good proxy and evidence of what would have been reasonable. Okay, do they get to toll it, toll that period during the time that your client was precluding access? Well, they would have already been basically up for three months by the time that that August 15th email went out. So the three months would have essentially been, and we could give them the benefit of the tolling, it really doesn't matter because they would basically go to 90 days. Well, how about this? I mean, so they had an agreement with CML that they had to get them off three months after the lease terminated. But what if CML was returning the cars in a condition where they couldn't just be moved? I mean, doesn't that make a difference? I think that that would mean perhaps provide a damages action against CML, but doesn't cite to the lease agreement as a barometer of if we're looking at what was reasonable. Yeah, I mean, my concern here is we're using, now we're using the lease agreement for one purpose, but it can't be used for another. I mean, because I mean, wouldn't it be fair for them to say, well, the lease agreement contemplated that we were going to get back cars that were serviceable? Fair enough, Your Honor. I think I still think that when we're talking about if what they said was 90 days, then we should we should be doing the 13 months in relative to that. I see that I'm short on, I have two minutes left. I'd like to save those for rebuttal. OK, Judge O'Bell. Thank you, counsel. Good morning, may it please the court. I'm Matthew Lawley. My partner, Troy Aramuro, is with me here today, but he'll defer the argument to me. There are two admissions, glaring admissions, in part based on contemporaneously recorded telephone conversations that really dispose of all of the arguments that the appellants are making contrary to the bankruptcy court's rulings. The first admission is when Steve Gilbert testifies, excuse me, doesn't testify, but he's talking to my clients and he says, we are taking these cars hostage. That's his word. What was the date of that? That's an August 20th telephone conversation. August 20 of? Of 2015. What happens, and let me just back up and give you a bit of a timeline because it's important. On May 8th of 2015, my clients are told by Steve Gilbert that Black Iron has acquired the mine and the property on which the tracks lay and on which the rail cars are present. And he says, come and get them. Wells Fargo says, we'll come and get them. They then go on for a three month period of time. They learn things like the tracks and the cars are in disrepair. They need to be repaired. They have other obstacles because they're a finance company, not a railroad. But they're mobilizing to remove those cars. They file a fraudulent transfer action on the 19th of August 2015. And the next day is when Steve Gilbert, in a recorded telephone conversation, says, I am going to hold the cars hostage. I shut the railroad cars. They're moving them. I stopped it. I said, no, no, no. If we're going to be in a fight, referring to the fraudulent transfer action filed the previous day, we're going to fight. But the cars has got a lien on them for storage. That's what he said. OK, so let's let's accept that as true. But your opposing counsel just said that beginning on September 17th that that was withdrawn, for lack of a better term. Opposing counsel does say that. What opposing counsel, a different set of lawyers, did not do was make that argument on summary judgment. In fact, on summary judgment, what GDC and Black Iron argued was that there was only a three month period of time. They argued that as of August 20th of 2015, there was a possessory lien. And that that August 20th was the date in which the the the rail cars could not be removed. That in and of itself would be sufficient. And it certainly was for summary judgment because this September 17th argument was not made. That was an argument that was resurfaced now with a second set of lawyers during trial. And it came up as a mitigation defense. Over our objection, we argued, Judge, you've already ruled that the conversion date was August 20th. And they said, oh, no, no, no, we're just raising this now as a mitigation defense. And if you look at the bankruptcy court's trial determination, you will see that explained. And he rules against it. He says it was not a mitigation defense. It's also a bit of a red herring because, as counsel just argued, in March of 2016, Wells Fargo was given permission again to go get the rail cars. Why would they need permission in March of 2016 if that door had been opened in September of 2015? So there's contradictory arguments. And in between, there had been contrary indications and they might have needed a reaffirmation. But there hadn't been. And that's what the dispute might be a dispute. And it was a dispute at trial. That was the mitigation argument they made. They argued that Wells Fargo failed to mitigate by getting the rail cars out soon enough, but only starting with September. And the evidence was to the contrary. Wells Fargo had people out there. They were looking at the repairs. There was a significant issue that Black Iron needed to, or Union Pacific needed Black Iron to confirm that the rails were stable to be removed because they weren't Black Iron's rails. They were Union Pacific's rails. So there was all sorts of evidence. And the bankruptcy court goes through this in great detail in his analysis of his memorandum decision on the trial. So, so just probably a little off base, but how, I mean, how does that work? So, so Black Iron doesn't own the rails. Black Iron doesn't own the cars. You need to move the cars on Union Pacific rails. And somehow it's held up because Union Pacific tells Black Iron that you can't move the cars until Black Iron inspects the rails and says they're, they're sufficient. I just wondering how that all plays out. Yeah, yeah. Well, what needed to happen was that Black Iron needed to affirm to Union Pacific that the rails were safe. They couldn't do that, of course, because the rails weren't safe. That's, that's what our experts were out doing and confirming. And we spent several hundred thousand dollars trying to repair the cars and rails. And yet we were interrupted in these starts and stops. It started in the summer of 2015. And then we were stopped on August 20th. They, they, they argued that on September 7th, there, September 17th, there was an internal email where they said, I guess we have the green light to go move. They actually acted upon it. They went out again in October and November and started to do again what they had began in the summer. And that continued through to March when in March they came out with the, the contradictory second confirmation. And they said, well, you can come get them now if you pay us $23 million. And that number fluctuated increasingly over time. But, but the important point for the summary judgment issues, for trespass, conversion and storage fees, is that they didn't argue that on summary judgment. And that's why on summary judgment, the court had no option but to determine that August 20th, 2015, was the date of conversion. That's what Blackiron argued. They argued that they had a possessory lien on that day. They argued, specifically referring to Wells Fargo had only three months to get these out and they didn't do it. And of course that wasn't true in the conversations and the record will show that. But, but that really refutes the argument that's been made today. Let me ask you another question. So, did you get the cars back? What, what happened is in 2018, we made a motion to the bankruptcy court. We made the motion saying, look, we need to go and get those out of there. We, what we wanted to do was sell them. By that time we'd found a buyer. We filed the motion. We paid a $10 million bond so that we could go on, repair the tracks and actually not repair them at that point, but so that we could sell them to a third party who could then come and do that. Okay. And so, so you liquidated your interest in the cars. Someone else came and got the cars. Blackiron doesn't have the cars. I'm not sure. I think the cars very well may be because the person who bought the cars is a business associate of Steve Gilbert. Okay. Well, we'll find that out in a minute. So let's, let's, I guess what I'm wondering is it seems like the district court, as damages, gave you the full value of the cars. The district court gave us the, and there was extensive expert testimony. You're talking about a trial. Right. There was extensive testimony, multiple experts, and he went through a thorough analysis and he gave, he gave us damages on both fraudulent transfer and conversion. The conversion damages were about $7.8 million. The fraudulent transfer damage is about $2.6 million. And it was, yes, in part based upon our expert testimony of the value of the cars. Okay. But, oh, I mean, doesn't it, doesn't it seem like that's erroneous in light of the fact that you still got to lick, you got paid the full value of the cars and you still got to liquidate your interest in the cars for what, I don't know what the consideration was, but it seems like you're getting paid twice for the cars and they got poured out on all their claims. So they get nothing. I'm not saying that they should, but I just, on the district court's damage calculation, that's, that I believe is challenged. It just seems odd. This is, this is the damages question that comes up all the time. You have to measure damages as of a specific point in time. And that's, that's the date of the conversion. Right. And that's why the experts have to measure the damages as of that date. So were you, were you arguing at the district court that you were permanently deprived of the, of the property or that it was a temporary? Temporary. Okay. And the temporary, the numbers for the temporary deprivation, according to your expert, just happened to be the full value of the cars? It was, it was the value of the cars at comparing at two different times. I mean, it was the value of the cars and the lease rate for that period of time. And through which we had, we did not have access to. Okay. Well, you, you measure the damages as of a specific point in time, but then you reduce from that mitigation issues that aren't on a specific point in time, because mitigation can happen anytime. So it is not just, you just Rip Van Winkle, you opened up your eyes one day and say, this is the value of the cars. Amen. That's the damages. You've got to look at the whole continuum because of the mitigation issue. Well, what, what you don't look at and I don't think it's a mitigation issue. It, it, it is the valuation of an asset that can fluctuate in value. And when you have that type of a situation, you measure the damages as of a specific point in time and you do not take into account either an increase in the value. As you hear, they're saying, they're saying, BlackRock is saying that, that Wells Fargo could have done things to mitigate that they didn't do. They, they argued mitigation at trial. And on the record, the court rejected their mitigation arguments. Why? Because he found that Wells Fargo in fact did mitigate and did everything that it needed to do to mitigate. Including. We have a finding by the district court that they mitigated fully their legal obligations so that you, you, you say, when we look at the district court's order, we're going to find that finding. They mitigated to the extent legally required of them. And then we've got to review that under what standard? Under a summary judgment standard? Under a finding of facts standard? What's our standard?  factual determination made at trial. And, and the mitigation argument that they made at trial was the mitigation argument that you've heard today, which is the September 17th issue. And it took 13 months to get the cars and that wasn't enough time. I've already explained why that argument fails. I've just got a minute to address the, the fraudulent transfer issues. And this gets to the second admission, which was an admission by, by multiple sources that there was actual intent. There, there was, there was Mike Conway of CML who said very clearly, the problem is Wells Fargo rail. We have to get in $2. million before Wells Fargo can see a dollar. He's talking to Steve Gilbert about that. And they're planning this asset purchase agreement, which is the vehicle for the transfer. And, and there are others and they're all cited in our papers and you can look through them. But there were contemporaneously recorded discussions. There were contemporaneous emails by Robert Getz, a board member, where they're saying, we need to push this back. We need to push out Wells Fargo. While what they were doing is working a sweetheart deal between Mike Conway, who was going to get a personal loan repaid for $2. million and Steve Gilbert, who was going to benefit by getting the mine at a bargain basement price. Thank you, counsel. Thank you. Judge Ebell, you have anything further? There's so many. But I'll, I'll be content to. I'll stick around afterwards. Yeah, right. Ms. Olson. Four brief points, your honors. First on the hostage quote that Mike, that my colleague mentioned, I just want to point out that was dated August 20th, the same date as the cease and desist email went back. All the evidence I discussed before, I discussed in my opening presentation is from emails and discussions that happened after, after that. And I, you can look that at, in volume 21, page 82 and volume four of the record, 27 and 37, gives a little bit of color on that very colorful language on my client, which clarifies that part of the reason that he said he was going to hold the cars hostage was because it was the first time that the name Wells Fargo had been introduced. And it wasn't, he wasn't even sure that the, that the cars belonged to Wells Fargo, the entity that filed the suit. Second point, your honor, they make an argument about preservation. I want to call the court's attention to page, to volume four, page 38 of the record, where we identified expressly as a dispute of fact, whether Wells Fargo's claim that it lacked access to remove the equipment from August 20th to March. And that's a volume, appellate volume four, 38. We said it is a disputed fact, and then we cited the August, the September 2017, 25th email that I referenced above. And we go on in our papers again, in summary judge, in our summary judgment papers, this is at appellate record for volume 43, sorry, page 43, where we again cite the September 17 conversations, noting that there is a disputed question of fact as to whether they regained access in September, September 17. Okay. So that, but that ends in March of 2016, not August. So you didn't preserve it all the way through August of 2016. Well, what we, what we, we did do it when we said this, there's a disputed fact as to whether or not access was cut off continuously or only for a short period of time, we said, we think that we restored access as of September, we then in an email, there's a discussion about the March, 2016 letter that was principally to that, the purpose of that letter was principally to assert in writing or claim for storage fees and not to provide some kind of new authorization for access, which was all, which was already existing. Okay. You're out of time. Counsel. Thank you. Did you value anything else? Uh, no. Okay. Thank you. The case is submitted and counsel are excused.